IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD DIVISION

DIANE SUSAN TERRY,

       Plaintiff,

v.                                    Case No.: 1:19-cv-00912

ANDREW M. SAUL,
Commissioner of the
Social Security Administration,

       Defendant.


**PROPOSED FINDINGS AND RECOMMENDATIONS**

      This action seeks a review of the decision of the Commissioner of the Social Security Administration *(*hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Motion for Summary Judgment and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 9, 11).

      The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **DENIED**; the Commissioner's request for judgment on the

pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On August 11, 2016, Diane Susan Terry ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of January 1, 2006 due to "multiple sclerosis, fibromyalgia, severe back problems, [and] deep depression." (Tr. at 229-41, 300). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 15). Claimant amended her alleged onset date to July 21, 2016 and requested an administrative hearing, which was held on November 2, 2018 before the Honorable Nathan Brown, Administrative Law Judge. (Tr. at 38-77, 294). By written decision dated January 11, 2019, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 12-37). The ALJ's decision became the final decision of the Commissioner on October 28, 2019 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8). Claimant filed a Motion for Summary Judgment and Brief in Support of the Motion for Summary Judgment, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 9, 10, 11). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 52 years old on her amended alleged onset date and 55 years old on the date of the ALJ's decision. (Tr. at 28). She obtained a general education diploma

(GED) and a certificate in business management from a two-year technical college. (Tr. at 58, 301). She previously worked as a licensed realtor, bookkeeper, housekeeper, receptionist, and secretary. (Tr. at 59, 301).

### III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the

limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§

404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2019. (Tr. at 18, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since July 21, 2016, the amended alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ

found that Claimant had the following severe impairments: diagnosis of multiple sclerosis (MS), history of right breast cancer with right breast mastectomy, left shoulder degenerative change, and diagnosis of neuropathy. (*Id.*, Finding No. 3). The ALJ considered Claimant's fibromyalgia, carotid stenosis, low back pain, depressive disorder, generalized anxiety disorder, somatic symptoms disorder, and post-traumatic stress disorder (PTSD), but found that the impairments were non-severe. (Tr. at 18-22).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 22-23, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a range of medium work. More specifically, the claimant can lift and/or carry 50 pounds occasionally and 25 pounds frequently; can sit for up to six hours in an eight-hour workday; can stand and/or walk for up to six hours in an eight-hour workday; can push and/or pull as much as can lift and/or carry; can frequently reach overhead with the left arm; can frequently climb ramps and stairs and occasionally climb ladders, ropes or scaffolds; can occasionally crawl; can occasionally work [at] unprotected heights and in dust, odors, fumes and pulmonary irritants; and, can frequently work with moving mechanical parts, in extreme cold, in extreme heat and in vibration.

(Tr. at 23-28, Finding No. 5).

At the fourth step, the ALJ determined that Claimant did not have any past relevant work. (Tr. at 28, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with Claimant's RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 28-29, Finding Nos. 7 through 10). The ALJ considered that (1) Claimant was born in 1963 and was defined as an individual closely approaching advanced age on the amended alleged disability onset date, but she subsequently changed age category to advanced age; (2) Claimant had at

least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because Claimant did not have past relevant work. (Tr. at 28, Finding Nos. 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a material handler, hand packer, or stock clerk. (Tr. at 28-29, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 29, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts three discernable challenges to the Commissioner's decision. (ECF No. 10 at 12-16). First, she contends that the ALJ's conclusion that her mental impairments were non-severe is not supported by substantial evidence. Second, Claimant asserts that the ALJ did not properly consider the opinions of psychologist, Teresa Jarrell, who performed a consultative examination and later became a treating source. Third, Claimant argues that the ALJ did not compare her allegations to the overall record, but instead examined them only in regard to her credibility, truthfulness, honesty, and character.

In response to Claimant's challenges, the Commissioner argues that substantial evidence supports the ALJ's determination that Claimant's mental impairments were non-severe, and the ALJ properly evaluated Ms. Jarrell's opinions and Claimant's subjective complaints. (ECF No. 11 at 8-17).

## V.    **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

7

### A. *Treatment Records*

On March 26, 2014, Claimant underwent a brain MRI to evaluate her complaints of a right-sided vision disturbance. (Tr. at 684). The test showed a hyperintensity that possibly indicated a demyelinating disease such as multiple sclerosis (MS), but follow-up evaluation of Claimant's cerebral spinal fluid was necessary for better assessment. (*Id.*).

Claimant presented to neurologist, Fletcher Lee Hartsell, III, M.D., at Duke Health on July 27, 2014 to further evaluate the intermittent vision loss in Claimant's right eye. (Tr. at 442). Claimant stated that the episodes began four to six months earlier, occurred every two weeks, and progressed from lasting for one minute to persisting for up to ten minutes. (*Id.*). Claimant admitted that she did not have any episodes in the past four weeks after the "stress from planning her daughter's wedding" passed. (*Id.*). Dr. Hartsell recorded that Claimant was somewhat vague about the vision loss. (*Id.*). Claimant also complained of chronic blurry vision, fibromyalgia that she admitted was significantly improved on medications, diffuse extremity weakness, numbness in her fingertips, left sciatic pain for the past 26 years due to a herniated disc, and a fist-sized area of chest pressure. (*Id.*). Dr. Hartsell noted that Claimant's March 2014 brain MRI was more indicative of clinically isolated syndrome (CIS) than MS, and her right vision loss symptoms were more suggestive of ocular migraine without headache. (*Id.*). Nonetheless, Dr. Hartsell ordered blood tests and a lumbar puncture to rule out MS. (*Id.*).

On June 2, 2015, Claimant arrived at the emergency room (ER) in Princeton Community Hospital complaining of numbness and tingling in her face for the past two days. (Tr. at 412). Claimant reported that she had MS, but "never had a problem like this

before." (*Id.*). She told the ER staff that she was seeing a neurologist at Duke University, but he wanted to withhold treatment for MS until her lumbar puncture. (*Id.*). The attending physician thought that Claimant possibly suffered a TIA/CVA, but Claimant had no other neurological findings. (Tr. at 414). Alternatively, the physician considered Lyme's Disease or progression of Claimant's MS. (*Id.*). Claimant's EKG was normal, and the CT of her head did not indicate any abnormalities. (Tr. at 417, 418). The physician did not find any life-threatening conditions and discharged Claimant to follow up with her neurologist. (Tr. at 414).

On June 30, 2015, Dr. Hartsell noted that Claimant's cerebral spinal fluid (CSF) analysis showed no evidence of demyelinating disease, and her MRI findings remained stable and likely showed only small vessel ischemic changes. (Tr. at 447); *see* (Tr. at 445-46). Dr. Hartsell diagnosed Claimant with fibromyalgia, lumbar degenerative disc disease, and chronic pain. (Tr. at 443). For fibromyalgia control, Dr. Hartsell increased Claimant's dosage of amitriptyline, and he also prescribed gabapentin and aspirin. (Tr. at 444, 447).

Claimant presented to primary care provider Mary Lester, P.A., on July 11, 2016, complaining of paresthesia in her feet, arms, fingertips, and face for the past two days. (Tr. at 470). Claimant also reported leg pain and associated numbness that began one to two weeks earlier, as well as depression and insomnia. (*Id.*). On examination, Claimant was alert and oriented with appropriate affect and demeanor, her memory was intact, and she had good insight and judgment. (Tr. at 472). P.A. Lester ordered blood tests, administered steroid injections in Claimant's hips for MS, and prescribed a nonsteroidal anti-inflammatory drug (NSAID), Topamax, and a Lidocaine patch. (Tr. at 473).

On July 22, 2016, Claimant presented to the ER at Princeton Community

Hospital, stating that she had suffered chest tightness and squeezing every day for the past month, as well as occasional paresthesia in her left arm. (Tr. at 388). She also reported intermittent numbness in her left arm that she attributed to MS, although Claimant admitted that she had not seen a neurologist in a year due to lack of insurance. (*Id.*). Claimant stated that she came to the hospital because her symptoms were increasing in frequency. (*Id.*). Claimant's EKG was unremarkable, her neurological findings were normal, and her stress test showed no evidence of ischemia or infarction. (Tr. at 387, 389, 401).

Claimant presented to Virginia Hull, P.A., for her yearly gynecological examination on July 26, 2016. (Tr. at 478). Her current problems included MS, depressive disorder not elsewhere classified, tobacco abuse, diffuse arthralgia, sore throat, and carotid artery stenosis. (Tr. at 479). Claimant was alert and oriented with appropriate affect and demeanor during the examination. (Tr. at 480). However, two days later, Claimant told Nicholas Mark Hudak, P.A., at Duke that she suffered left-sided numbness and motor impairment for the past four to six hours. (Tr. at 448). Her only ongoing neurological symptoms were chronic low back pain with occasional bilateral sciatica. (*Id.*). She was alert and appeared comfortable, had full muscle strength in all extremities and intact sensation and coordination, and was fully oriented with appropriate affect and fluent speech. (Tr. at 449). P.A. Hudak ordered a brain MRI to evaluate the neurological symptoms. (Tr. at 452).

On September 9, 2016, Claimant presented to spine surgeon, Melissa M. Erickson, M.D., regarding lumbar pain. (Tr. at 867). Claimant stated that she suffered low back pain and radiating leg pain for 20 years, but it gradually worsened over time. (*Id.*). She noted that she received an injection five years earlier, which provided near

complete relief of her radiating symptoms. (*Id*.). Claimant reported that she suffered throbbing pain all day, primarily in the left side of her back, thigh, shin, and dorsum of her foot. (*Id*.). On examination, her lumbar area was not tender to palpation; her gait was normal; her lumbar range of motion was normal and pain-free; she had full motor strength in her lower extremities, except for mildly reduced strength of 4/5 in her left hamstring; her sensation and reflexes were intact; and she had full range of motion and negative impingement tests in her hips. (Tr. at 868-70). Her mood and affect were normal. (Tr. at 868). Imaging of Claimant's spine showed some degenerative disc disease and facet arthropathy, but no evidence of gross spondylolisthesis. (Tr. at 870). Dr. Erickson did not see any indication for surgical intervention. (*Id*.). She ordered an MRI and referred Claimant to a non-surgical spine physician for consideration of injections or other modalities. (*Id*.).

Claimant presented as a new patient to primary care physician, Quartel-Ayne Amjad, M.D., on February 7, 2017. Dr. Amjad noted that Claimant was told years ago that she possibly had MS, but it was not clear that she had any history of the condition. (Tr. at 509). Claimant also reported a history of carotid stenosis for which she was taking aspirin and tinnitus, which Dr. Amjad noted could be related to the use of aspirin. (*Id*.). Claimant was fully oriented, active, and alert with normal mood, affect, and memory and good judgment. (*Id*.). Dr. Amjad diagnosed Claimant with unspecified neuropathy, carotid artery stenosis, and tinnitus. (*Id*.). Dr. Amjad requested Claimant's records, ordered laboratory tests, and continued Claimant on Neurontin and amitriptyline. (*Id*.).

On February 23 and March 20, 2017, Claimant had a follow-up mammogram and ultrasound, respectively, because her mammogram earlier in February showed an abnormality in her right breast that was suspected to be calcifications related to her

breast implants, or a malignancy. (Tr. at 516, 520, 522). The tests indicated the need for a biopsy, which revealed that Claimant had ductal carcinoma. (Tr. at 518). Claimant met with surgeon, Todd Witsberger, M.D., on April 3, 2017, to discuss breast surgery options. (Tr. at 550). Dr. Witsberger noted the limitations regarding conserving Claimant's right breast, and Claimant's primary concern was breast reconstruction. (Tr. at 551).

On May 8, 2017, Claimant followed up with Dr. Amjad. Claimant reported depression, sleep disturbances, and restless sleep. (Tr. at 615). Dr. Amjad listed the date of onset of depression as the day of the examination, May 8, 2017. (Tr. at 616). Claimant had normal mood and affect; demonstrated good judgment; was active, alert, and fully oriented; and her recent and remote memory were normal. (Tr. at 616). Dr. Amjad diagnosed Claimant with a single episode of major depressive disorder. (Tr. at 617). She prescribed Paxil for hot flashes and depression and Vistaril as needed, and she refilled Claimant's prescriptions for Neurontin and amitriptyline. (*Id.*).

Claimant underwent a right mastectomy May 23, 2017, which left her breast implant in place, but she developed inflammation and erythema necessitating removal of the implant on June 7, 2017. (Tr. at 556, 529-30). Dr. Witsberger noted during Claimant's follow-up appointment on June 28, 2017 that Claimant's margins were negative, there was no evidence of any invasive component of the breast cancer, and her mastectomy wound was healing well. (Tr. at 552).

On September 26, 2017, Claimant presented to Ashley Fleenor, P.A., at Dr. Amjad's office, complaining of sharp pain in her right chest wall, severe fatigue and depression, and a flare-up of fibromyalgia that caused pain in her shoulders, hips, and knees. (Tr. at 606). Claimant appeared depressed and was very tearful throughout the examination, but she demonstrated good judgment; was active, alert, and fully oriented

with a normal affect; and her recent and remote memory were normal. (*Id.*). P.A. Fleenor prescribed a Medrol pack for acute pain and Paxil for depression, renewed Claimant's prescriptions for Neurontin and amitriptyline, and ordered blood work and a chest ultrasound. (Tr. at 607). On December 22, 2017, Claimant told Dr. Amjad that her mood was better, and she denied depression. (Tr. at 595). On examination, she again demonstrated good judgment; had normal mood, affect, and memory; and was active, alert, and fully oriented. (*Id.*).

Claimant presented to the ER at Raleigh General Hospital on January 23, 2018. She complained of left arm and shoulder pain for the past three days. (Tr. at 716). The provider noted that Claimant's symptoms were mild in severity, even at their worst, and they improved in the ER. (*Id.*). Claimant believed that the symptoms were possibly caused by lifting her granddaughter. (*Id.*). Claimant was diagnosed with tendonitis and given a steroid injection. (Tr. at 718-19). Claimant followed up with Dr. Amjad on January 26, 2018. She demonstrated good judgment and normal mood, affect, and memory, and she was active, alert, and fully oriented. (Tr. at 583). However, Claimant stated that she still had left shoulder and arm pain and some numbness in her left hand. (*Id.*). Claimant told Dr. Amjad that she had a knot in her left upper extremity that was getting bigger and felt tender. (*Id.*). Dr. Amjad ordered an x-ray and ultrasound. (Tr. at 584). The ultrasound indicated that the mass was possibly a lipoma. (Tr. at 564). Claimant's x-ray showed possible mild ligamentous injury or borderline to minimal displacement of the left lateral end of the clavicle, and a mild to moderate inferior bone spur in the medial end of the acromion. (Tr. at 792). The benign lipoma in Claimant's left deltoid area was excised on February 14, 2018. (Tr. at 725). Claimant recovered well from the surgery. (Tr. at 761).

On March 2, 2018, Claimant told Dr. Amjad that her only complaints were muscle aches, arthralgias/joint pain, and right chest wall pain. (Tr. at 575). Her musculoskeletal examination indicated hypotonicity, tenderness, and limited range of motion. (Tr. at 575). For neuropathy, Claimant requested to wean off of Neurontin, but she wanted to continue taking Norco for pain management. (Tr. at 575-76). Dr. Amjad noted a diagnosis of depression, although Claimant denied depression in her review of systems. (Tr. at 576). Claimant's mental status was normal, including good judgment; normal mood, affect, and memory; active and alert behavior; and orientation in all spheres. (Tr. at 575). Dr. Amjad referred Claimant for a mammogram to move forward with breast reconstruction, and he renewed her prescription for amitriptyline. (Tr. at 576). Claimant's mammogram on March 29, 2018 was clear with no suspicious lesions. (Tr. at 787).

On May 31, 2018, Claimant told Dr. Amjad that she experienced muscle aches, arthralgias/joint pain, and left sciatic pain, but no muscle weakness, numbness, back pain, vision change, depression, or sleep disturbances. (Tr. at 774). On examination, she remained active, alert, and oriented and she displayed good judgment and normal mood, affect, and memory. (*Id.*). Claimant was considering moving to North Carolina with her daughter at the end of the summer. (*Id.*). Dr. Amjad renewed Claimant's Neurontin prescription for chronic pain. (*Id.*). Claimant discussed that she had injections in her back years earlier for sciatica, and she requested a referral to see if it would help. (Tr. at 774).

Claimant met with a plastic surgeon on June 12, 2018 to schedule breast augmentation of her right breast and a left breast lift. (Tr. at 801). Claimant said that her medical issues were resolved, and she decided to have reconstructive surgery to put

things behind her. (*Id.*). She denied feeling down, depressed, or hopeless or having little interest or pleasure doing things. (*Id.*). Claimant followed up with Dr. Amjad on July 13, 2018 and, like her previous appointment, she reported muscle aches, arthralgias/joint pain, and left sciatic pain, but no muscle weakness, numbness, back pain, vision change, depression, or sleep disturbances. (Tr. at 766). On examination, she was active, alert, and oriented and she displayed good judgment and normal mood, affect, and memory. (*Id.*). Dr. Amjad diagnosed Claimant with neuropathy and prescribed Norco and Neurontin. (Tr. at 767).

On August 29, 2018, Claimant presented to the ER at Princeton Community Hospital, reporting that she stumbled over her left foot at home, and it was bruised, swollen, and painful. (Tr. at 781). Her x-ray showed no fracture, and she had normal range of motion in her ankles and feet, sensation, and motor functions. (Tr. at 782, 785). She was given Demerol injections, her foot/ankle was wrapped in an Ace bandage, and she was prescribed Keflex and ibuprofen. (Tr. at 783-84). Claimant denied having any psychiatric symptoms and was alert and oriented in the ER. (Tr. at 782).

On September 24, 2018, Claimant returned to the ER at Princeton Community Hospital after she was rear-ended by another car while she was driving. (Tr. at 886). She did not have any passengers in her car, and there were no other reported injuries from the collision. (*Id.*). Claimant's air bag did not deploy. She was ambulatory at the scene and did not require a neck collar or backboard. (*Id.*). Claimant denied any neurological symptoms. (Tr. at 887). On examination, her neck was tender, but she had full range of motion in her cervical spine. (*Id.*). She had no complaints or abnormalities in the examination of her back or extremities, and she denied psychiatric symptoms and had a normal mood and affect. (Tr. at 887-88). Claimant was diagnosed with neck pain and

neck muscle strain, given pain medication, and discharged in stable condition. (Tr. at 889).

On October 26, 2018, Claimant told Dr. Amjad that she still had muscle aches and weakness, arthralgias/joint pain, right chest wall pain, and left sciatic pain, but she did not have any symptoms of depression or sleep disturbances. (Tr. at 933). She again had a normal psychiatric examination. (*Id.*). Claimant's diagnosis was neuropathy, and Dr. Amjad refilled her prescriptions for Norco and amitriptyline. (Tr. at 934). Claimant was no longer taking muscle relaxants, and she wanted to wean off of Neurontin, so Dr. Amjad reduced her dosage by half. (*Id.*).

### B. Evaluations and Opinions

On December 22, 2016, James B. Smith, M.D., assessed Claimant's physical RFC. Dr. Smith concluded that Claimant could perform work at the medium exertional level with frequent postural activities. (Tr. at 89-90). Thomas Lauderman, D.O., affirmed this assessment on April 4, 2017, except that Dr. Lauderman additionally assessed that Claimant should avoid concentrated exposure to extreme cold and hazards. (Tr. at 115-16). On January 25, 2017, Rosemary L. Smith, Psy.D., found that Claimant's depressive, bipolar, and related disorders were severe impairments, but there was insufficient evidence to assess her claim. (Tr. at 87). John Todd, Ph.D., affirmed this assessment on April 5, 2017. (Tr. at 112-13).

On May 17 and 30, 2018, Ms. Jarrell performed a psychological examination of Claimant at the request of Claimant's attorney. Claimant resided with her boyfriend at the time of the examination. (Tr. at 841). Regarding her education history, Claimant stated that her grades were good until she entered high school. (Tr. at 842). She reportedly had problems with reading comprehension. (*Id.*). Claimant told Ms. Jarrell

16

that she dropped out of high school in the tenth grade because she had to get a job, and she obtained a GED. (*Id.*). She also later obtained a realtor's license, but she claimed that someone gave her the questions and answers for the test, and she memorized them over the course of three months. (*Id.*). Claimant stated that she did not believe that she would have passed the test without that assistance. (*Id.*). Claimant last worked as a secretary and customer service representative, but she had not worked in at least six years. (*Id.*). Claimant stated that her health had deteriorated, and she was not able to do the activities that she used to do, causing her to gain 50 pounds. (*Id.*). She estimated that she was 5 feet and four inches tall and weighed 142 pounds. (Tr. at 843). Her activities included "some" cooking and watching television, and she talked or texted with her children, but she preferred not to leave the house. (Tr. at 843). Claimant reported having symptoms of depression since her divorce 20 years earlier, stating that she "never got over it." (*Id.*).

On examination, Claimant's eye contact was appropriate; mood was mildly anxious and depressed with restricted affect; orientation and immediate memory were within normal limits; concentration and insight were mildly deficient; recent memory and judgment were moderately deficient; and remote memory was severely deficient. (Tr. at 844.). Ms. Jarrell diagnosed Claimant with major depressive disorder, generalized anxiety disorder, somatic symptom disorder, and posttraumatic stress disorder. (Tr. at 852).

On October 15, 2018,[1] Ms. Jarrell completed a mental RFC questionnaire. (Tr. at 862). She noted that she evaluated Claimant in May 2018 and saw her for an outpatient

---

[1] This form is misdated October 15, 2019, but the fax stamp indicates that the document was faxed in 2018, and Claimant's brief states that the form was completed on October 15, 2018. (Tr. at 866); (ECF No. 10 at 14).

psychotherapy session in July 2018 with another appointment scheduled in October 2018. (*Id*.). Ms. Jarrell rated Claimant's functional abilities according to the following scale, which ranged from the highest to the lowest level of functioning: (1) unlimited or very good, (2) limited but satisfactory, (3) seriously limited but not precluded, (4) unable to meet competitive standards, and (5) no useful ability to function. The only area in which Ms. Jarrell found that Claimant had an unlimited or very good ability to function was her ability to adhere to basic standards of neatness and cleanliness. (Tr. at 864). In the next level of limited, but satisfactory, functioning, Ms. Jarrell marked that Claimant could remember work-like procedures and ask simple questions or request assistance. (*Id*.). Ms. Jarrell found that Claimant was seriously limited, but not precluded, from understanding and remembering very short and simple instructions, making simple work related decisions, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, interacting appropriately with the general public, and maintaining socially appropriate behavior. (Tr. at 864-65).

In the two lowest areas of functioning, Ms. Jarrell assessed that Claimant was unable to meet competitive standards in the areas of carrying out very short and simple instructions, maintaining attention for two hour segments, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions form psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, responding appropriately to changes in the routine work setting, dealing with normal work stress, being aware of normal hazards and taking appropriate precautions, understanding and remembering

18

detailed instructions, setting realistic goals and making plans independently of others, dealing with the stress of skilled and semiskilled work, traveling in unfamiliar places, and using public transportation. (*Id*.). Ms. Jarrell determined that Claimant had no useful ability to function in the areas of maintaining regular attendance and being punctual within customary, usually strict tolerances, and carrying out detailed instructions. (*Id*.).

### C. Claimant's Statements

Claimant testified during her administrative hearing on November 2, 2018. She stated that after she obtained her GED, she went to a technical college for two years and obtained a certificate in business management. (Tr. at 58). She also obtained her real estate license eight years earlier and worked for Century 21. (Tr. at 59). Thereafter, Claimant helped her fiancé operate a small car dealership from 2010 through 2016. (Tr. at 61-62). Claimant testified that she could not work because she was "either in pain or [had] no energy" to work. (Tr. at 49-50). She noted that she possibly had MS and listed her symptoms as visual disturbance, imbalance when walking, pain, and numbness in her feet and hands and sometimes the side of her face. (Tr. at 50-51). She had episodes of blurred vision, but generally could see, read, and drive. (Tr. at 66). Claimant stated that she only drove two days in a "bad week," and she typically only drove around town, but she occasionally drove to see her kids in Vegas. (Tr. at 66-67). According to Claimant, she could not even get dressed three to four days per week due to numbness, and she kept her pajamas on all day. (Tr. at 50). She used heating pads or sat in hot water on those days, and she took gabapentin for the numbness and Tylenol with codeine and hydrocodone for pain. (Tr. at 50-51). Claimant stated that she also had pain in her lower back, legs, and feet three times per week due to fibromyalgia. (Tr. at 52). On the days

that she was not bedridden, she estimated that she could stand for one hour and sit for one and one-half to two hours, but she had to lie down for three hours during the day with a heating pad on her lower back. (Tr. at 53-54). Claimant testified that she had "no energy" and "couldn't have a life" since she was diagnosed with cancer in March 2017, because she was always focused on surgeries or recovery. (Tr. at 54-56). She had three surgeries: the right mastectomy, removal of the right breast implant due to infection, and removal of the lipoma in her arm. (Tr. at 54-55). Claimant stated that she felt like she was in "a state of depression" 60 percent of the time. (Tr. at 56). Her symptoms reportedly included not wanting to get out of bed, thinking that "life sucks," not getting dressed, and not leaving her house for days a time. (Tr. at 56).

## VI.    **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v.*

20

*Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

**VII.    Discussion**

Claimant argues that the Commissioner's decision is unsupported by substantial evidence because the ALJ improperly (1) determined that her mental impairments were non-severe; (2) gave little weight to the opinions of Ms. Jarrell; and (3) scrutinized her credibility, as opposed to comparing her subjective allegations to the record. The issues are considered below, in turn.

### A. *Non-Severe Mental Impairments*

At the second step of the sequential evaluation process, the ALJ concludes whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. §§ 404.1522(a), 416.922(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). As relevant to the instant matter, basic work activities include the claimant's capacity to understand, carry out,

and remember simple instructions; use judgment; respond appropriately to supervision, co-workers, and usual work situations; and deal with changes in a routine work setting. 20 C.F.R. §§ 404.1522(b), 416.921(b).

As discussed, when a claimant alleges a mental impairment, the ALJ must apply the special technique at step two of the analysis. If the ALJ determines that the claimant has a medically determinable mental impairment, the ALJ rates the degree of functional limitation in four broad categories, known as the "paragraph B" criteria, which include: (1) understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself. 20 C.F.R. §§ 404.1520a(c), 416.920a(c). A rating of "none" or "mild" in the foregoing criteria will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1).

Importantly, the claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a severe impairment under step two, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other

hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54 (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

In this case, the ALJ examined Claimant's mental impairments at step two of the sequential analysis and performed the special technique. The ALJ considered that Ms. Jarrell diagnosed Claimant with generalized anxiety disorder, somatic symptom disorder, and PTSD during her consultative examination. (Tr. at 20). However, the ALJ noted that it was a one-time assessment performed by a non-treating source who examined Claimant at the request of Claimant's attorney for the primary purpose of generating evidence for the social security disability application, as opposed to a mental assessment for the purpose of treatment. (*Id.*). The ALJ remarked that the impairments were otherwise not indicated in the treating source records. (*Id.*). Therefore, the ALJ found that the impairments did not last for, nor were they reasonably expected to last for, a consecutive 12-month period. (*Id.*). Thus, the ALJ found that Claimant's anxiety disorder, somatic symptom disorder, and PTSD were non-severe. (*Id.*).

The ALJ next considered Claimant's depression. The ALJ discussed that Ms. Jarrell diagnosed Claimant with depressive disorder, and the impairment was mentioned intermittedly in Claimant's treatment records. (*Id.*). However, the ALJ found that there was no continuous working diagnosis of depression or evidence that the condition lasted for, or was reasonably expected to last for, any 12-month consecutive period. (*Id.*). Therefore, the ALJ found that Claimant's depressive disorder was likewise

non-severe because it did not meet the durational requirements. (*Id*.).

The ALJ explained that, even assuming *arguendo* that Claimant's mental impairments were properly documented as meeting the durational requirements, they were nonetheless non-severe because they did not cause more than minimal limitation in her ability to perform basic mental work activities since her alleged onset date on July 21, 2016. (*Id*.). First, the ALJ noted that Claimant did not allege that she had an anxiety disorder, somatic symptom disorder, or PTSD. (*Id*.). Rather, according to the ALJ, Claimant offered some general allegations regarding depression, which she said affected her memory, concentration, and ability to complete tasks, but she primarily attributed those functional deficits to physical problems. (*Id*.). The ALJ noted that, during the administrative hearing, Claimant responded to her counsel's leading questions regarding mental impairments, but she focused on her physical problems. (*Id*.). Second, the ALJ found that Claimant's statements regarding her activities were evasive, vague, and inconsistent, and he cited examples of Claimant's inconsistent statements concerning her ability to drive, shop, and prepare meals. (Tr. at 20-21). Third, the ALJ considered that Claimant did not seek out or receive any regular mental health treatment since her alleged onset date. (Tr. at 21). Fourth, the ALJ noted that Claimant rarely and infrequently alleged depression or anxiety to her medical providers, and there were fewer than five examinations in which there was any abnormality in Claimant's mental status examination, only one of which indicated anything more than a generalized depressed and/or anxious mood or affect. (*Id*.). In contrast, the ALJ cited Claimant's numerous normal mental status examinations, finding that the record overall lacked any evidence of significant and persistent mental deficits or any increasingly intensive mental health treatment. (*Id*.).

The ALJ specifically considered Ms. Jarrell's consultative examination report and mental RFC assessment, noting that Ms. Jarrell assessed that Claimant was "unable to meet competitive standards" in nearly every area of functioning and/or not able to perform full-time employment and was expected to be excessively off-task or absent. (Tr. at 21). However, the ALJ found that the mental deficits that Ms. Jarrell noted were not corroborated by the longitudinal record. (*Id.*). The ALJ discussed that Ms. Jarrell's findings were largely reliant on Claimant's subjective self-report, and Claimant's statements were vague, and/or evasive and suggestive of exaggeration. (*Id.*). For instance, Claimant told Ms. Jarrell that she gained 50 pounds, but she was approximately the same weight of 141 pounds on the date of her examination as she was on her amended alleged onset date. (*Id.*). Moreover, the ALJ found that Ms. Jarrell considered Claimant's physical impairments, which was outside of her area of expertise, including Claimant's fibromyalgia, which was not even a medically determinable impairment. (*Id.*). The ALJ noted that Claimant advised Ms. Jarrell that she was not receiving any mental health treatment and had not recently received any mental health treatment. (*Id.*). Thus, the ALJ found that Ms. Jarrell's report was not reasonably representative of Claimant's level of functioning if she was compliant with medical management. (*Id.*). Ultimately, after weighing all of the evidence, the ALJ determined that Claimant had no more than mild restrictions in her ability to understand, remember, or apply information; interact with others; and maintain concentration, persistence, or pace; and she had no difficulty adapting or managing herself. (Tr. at 22).

The ALJ's foregoing analysis is supported by more than a scintilla of evidence. Claimant occasionally complained of depression to her treatment providers. (Tr. at 470, 606, 615). However, her mental status examinations were grossly normal other than a

few instances of abnormal mood or affect. (Tr. at 449, 472, 480, 509, 575, 583, 595, 606, 616, 766, 774, 868, 888, 933). Dr. Amjad diagnosed Claimant with a single episode of depression with an onset date of May 8, 2017. (Tr. at 616). He prescribed Paxil to "help with hot flashes and depression." (Tr. at 617). Claimant continued to complain of severe fatigue and depression on September 26, 2017, and P.A. Fleenor renewed Claimant's prescription for Paxil. (Tr. at 606-07). By December 22, 2017, Claimant told Dr. Amjad that her mood was better, and she reported no depression. (Tr. at 595). Claimant continued to deny depression and psychiatric symptoms throughout 2018. (Tr. at 576, 766, 774, 782, 801, 878, 933).

Therefore, as the ALJ concluded, there was no continuing diagnosis or treatment for depression to meet the 12-month durational requirement. It is irrelevant, as Claimant suggests, whether Claimant was diagnosed with depression at some point in 2012. (ECF No. 10 at 12). There are only a few scattered references to depressive symptoms, and Claimant generally denied psychiatric symptoms after her alleged onset date. Furthermore, the other psychiatric diagnoses made by Ms. Jarrell, including generalized anxiety disorder, somatic symptom disorder, and PTSD, were not diagnosed by any treating provider or reflected anywhere elsewhere in the record other than Ms. Jarrell's one-time consultative examination. Regarding the only other opinion evidence in the record, although the state agency physicians in this matter assessed severe mental impairments, they concluded that there was insufficient evidence to even evaluate Claimant's applications. (Tr. at 87, 112-13).

Claimant focuses on the fact that she was continually prescribed amitriptyline to establish that her mental conditions were severe and met the durational requirements. (ECF No. 10 at 12-13). However, the record indicates that the medication was, at least

partly, used to treat Claimant's physical conditions, such as fibromyalgia and neuropathy. (Tr. at 447, 509, 934). The medication was renewed during some visits when Claimant was not diagnosed with any mental conditions and during which she specifically denied depression. (Tr. at 509, 933). Therefore, the fact that Claimant was prescribed amitriptyline for an extended period does not undermine the ALJ's conclusion that Claimant did not have a mental condition that met the 12-month durational requirement.

As the ALJ considered, Claimant did not suffer any significant exacerbations of mental health symptoms, require hospitalization, or receive any specialized mental health treatment, other than one psychotherapy session with Ms. Jarrell in October 2018. Furthermore, although Claimant stated that she had symptoms of depression since her divorce 20 years earlier, and she felt depressed 60 percent of the time and did not want to get out of bed, she maintained relationships with her children, occasionally drove to Vegas to visit them, interacted appropriately with her medical providers, and had consistently normal mental status examinations. (Tr. at 56, 67, 843).

Overall, Claimant fails to identify any relevant conflicting evidence that the ALJ overlooked concerning Claimant's mental impairments, nor does she show that the ALJ failed to apply the correct law, or that he made any other error that rendered his decision unsupported by substantial evidence. Claimant is simply asking the court to re-weigh the medical evidence and reach different conclusions than the ALJ, which is not the Court's role in reviewing the Commissioner's decision. The Court must uphold the Commissioner's decision if it is supported by more than a scintilla of evidence. It is not the province of the Court under 42 U.S.C. § 405(g) to weigh the evidence or perform the special technique to evaluate the severity of a claimant's mental impairments. Where, as

in this case, the ALJ considered the evidence, provided logical reasons for his conclusions, applied the correct legal standards, and there is more than a scintilla of evidence to support the ALJ's findings, the Court must affirm the Commissioner's decision. Therefore, the undersigned **FINDS** that the ALJ's step two analysis of Claimant's mental impairments is supported by substantial evidence.

### B. Weight of Ms. Jarrell's Opinion

Claimant next argues that the ALJ improperly analyzed Ms. Jarrell's mental RFC assessment as a non-treating source opinion, although Ms. Jarrell was her treating psychologist at the time of the assessment, and that the ALJ erred in giving Ms. Jarrell's opinions little weight. When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's

opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.[2] *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[3] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251,

---

[2] The special deference afforded to the opinion of a treating physician, often called the "treating physician rule," was eliminated for claims filed on or after March 27, 2017. 20 C.F.R. §§ 404.1520c, § 416.920c; *Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p,* 2017 WL 3928298 (S.S.A. Mar. 27, 2017). However, Claimant's applications were filed in 2016, and the treating physician rule applied to her claims.

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record

as a whole. *Id.* at *3.

In this case, Ms. Jarrell was consulted, at the request of Claimant's attorney, to examine Claimant in order to generate evidence for Claimant's social security disability applications. She examined Claimant on May 17, 2018 and Claimant completed questionnaires related to her evaluation on May 30, 2018. (Tr. at 843). Claimant does not dispute that the ALJ correctly adjudged that Ms. Jarrell's opinions related to the consultative examination were non-treating source opinions. (ECF No. 10 at 14). However, Claimant argues that the mental RFC assessment form that Ms. Jarrell completed five months later, on October 15, 2018, was a treating source opinion because Ms. Jarrell noted on that form that she provided an outpatient psychotherapy session to Claimant on July 20, 2018, and Claimant was scheduled for another session with her on October 19, 2018. (*Id.*); (Tr. at 862).

The regulations define the term "treating source," as follows:

> Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

As indicated above, Ms. Jarrell first encountered Claimant as a consultative

examining psychologist, and she subsequently only treated Claimant for one psychotherapy session before completing the mental RFC assessment form. The form very clearly instructed Ms. Jarrell to "[a]ttach all relevant treatment notes and test results" that had not yet been provided to the SSA. (Tr. at 862). Ms. Jarrell did not provide any treatment notes or test results to support her RFC assessment. Rather, she referenced the test results and findings from the consultative examination. (Tr. at 862-66). When discussing Claimant's prognosis, Ms. Jarrell mentioned "current test results." (Tr. at 862). However, no additional test results were provided beyond the May 2018 consultative examination. Therefore, given the fact that Ms. Jarrell was hired as a consultative examiner and based her opinions on that examination, the ALJ's conclusion that Ms. Jarrell's October 2018 mental RFC form was a non-treating source opinion was supported by substantial evidence.

The ALJ's decision to afford little weight to Ms. Jarrell's opinions is likewise supported by substantial evidence. As the ALJ explained, the extreme deficits that Ms. Jarrell assessed and her opinion that Claimant was unable to work were starkly inconsistent with the longitudinal record, including Claimant's lack of any specialized mental health treatment, normal mental status examinations, and the general dearth of evidence concerning any significant mental health issues or mental functional limitations. Moreover, the ALJ determined that Ms. Jarrell's findings were largely based on Claimant's subjective self-reported symptoms, and Ms. Jarrell even considered the effects of Claimant's fibromyalgia, which was not within Ms. Jarrell's area of expertise and weighed against the validity of her opinions.

For those reasons, the undersigned **FINDS** that the ALJ properly examined Ms. Jarrell's opinions, weighed them, and provided clear explanations for the weight given

to them. The ALJ supplied references to the evidence to clarify and support his conclusions, and his analysis is supported by substantial evidence.

### C. Subjective Symptom Analysis

Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929 (effective March 27, 2017). First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id*. §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id*. §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion

about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) a longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

In *Hines v. Barnhart*, the Fourth Circuit stated that:

Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are

> inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine

if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the ALJ clearly performed the two-step process. The ALJ noted Claimant's allegations regarding MS, fibromyalgia, depression, pain, lack of energy, and history of breast cancer. (Tr. at 24). Ultimately, after considering the evidence, the ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (*Id.*). However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record" for several reasons. As discussed above, the ALJ explained, in detail, the inconsistencies between Claimant's allegations that she was depressed and did not even want to get out of bed and the other evidence in the record, including Claimant's unremarkable mental status examinations, lack of any particularized mental health treatment, and daily activities. Regarding breast cancer, the ALJ noted that the cancer did not metastasize, and it was immediately responsive to surgical intervention without any additional modalities, such as chemotherapy or radiation. (Tr. at 25). The ALJ also considered Claimant's alleged limitations relating to her left upper extremity. However, the ALJ cited the mild diagnostic and clinical findings and the fact that Claimant did not have any sustained redness, warmth, swelling, crepitus, laxity, joint instability, or

muscle atrophy or wasting, and her sensation, reflexes, and fine and gross manipulation were preserved. (Tr. at 26). Finally, regarding MS and neuropathy, the ALJ discussed that Claimant was never definitely diagnosed with either condition, her diagnostic tests showed stability, and her neurological findings were normal. (Tr. at 26-27). The ALJ also considered the opinion evidence, noting that the state agency physicians concluded that Claimant could perform a range of work at the medium exertional level. (*Id.*).

Claimant asserts that the ALJ erred in evaluating her credibility, truthfulness, honesty, and character, as opposed to comparing her allegations to the medical treatment records, her reported activities, and testimony. However, as shown above, the ALJ precisely performed that function. The ALJ considered Claimant's alleged symptoms and limitations and found them to be inconsistent with the treatment records, diagnostic tests, and opinion evidence for the reasons stated above.

The ALJ did note inconsistencies in Claimant's statements, such as telling Ms. Jarrell that she gained 50 pounds due to her health deteriorating and her not being able to do the activities that she used to do. (Tr. at 21). Claimant told Ms. Jarrell that she weighed around 142 pounds on the date of her consultative examination in May 2018, but she similarly weighed 140 pounds in April 2014 and 139 pounds six days after her alleged onset of disability in July 2016. (Tr. at 449, 456, 843). The ALJ noted that Claimant's reports and/or testimony regarding her activities were evasive and vague at times. (Tr. at 20). For instance, she denied preparing meals, but then stated that she "maybe" did so; denied shopping, but later admitted driving to a convenience store; and minimized her ability to drive, yet she drove out of state to visit her family. (Tr. at 20, 24). Claimant fails to identify any error in this analysis. The ALJ was charged with evaluating and weighing the evidence, which included examining Claimant's statements

and her daily activities. This information was relevant to Claimant's functional abilities and squarely within the scope of the ALJ's purview.

As shown above, the ALJ properly considered Claimant's statements, her daily activities, and the medical evidence to evaluate the intensity, persistence, and severity of Claimant's reported symptoms. Claimant offers nothing to rebut the ALJ's well-reasoned conclusions and specific citations to the record. Therefore, the undersigned **FINDS** that substantial evidence supports the ALJ's subjective symptom analysis.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's Motion for Summary Judgment, (ECF Nos. 9); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 11); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: July 29, 2020

Cheryl A. Eifert
United States Magistrate Judge